IN THE MATTER OF DAVID L. COLLINS

No. 8021DC355

(Filed 21 October 1980)

1. **Insane Persons § 1.2– involuntary commitment – unconditional discharge – appeal not mooted**

    Respondent's unconditional discharge did not moot his appeal from an involuntary commitment proceeding.

2. **Insane Persons § 1.2– involuntary commitment – review by appellate court**

    The function of the appellate court in an appeal from an involuntary commitment order is to determine whether there was any competent evidence to support the facts recorded in the commitment order and whether the trial court's ultimate findings of mental illness and dangerousness to self or others were supported by the facts recorded in the order.

3. **Insane Persons § 1.2; Evidence § 50– expert psychiatric testimony**

    A psychiatrist's "mental status" examination of respondent for approximately thirty minutes provided sufficient data to support the psychiatrist's expert opinion in an involuntary commitment proceeding and to remove his opinion from the realm of mere conjecture or speculation.

4. **Insane Persons § 1.2 – involuntary commitment – dangerousness to self or others – sufficiency of evidence**

    In this involuntary commitment proceeding, the trial court's finding that respondent was dangerous to himself was supported by testimony that he deliberately cut himself with a knife and deliberately exposed himself to danger by sitting on the edge of a busy airport runway, and the trial court's finding that respondent was dangerous to others was supported by testimony that he kept an iron pipe and hatchet under his bed, that he required his mother through threats to sit in one chair and not move for two hours while he was screaming, shouting and cursing, and that he threatened to "bust" his mother's head if she called anyone.

APPEAL by respondent from *Keiger, Judge.* Order entered 21 December 1979 in District Court, FORSYTH County. Heard in the Court of Appeals 11 September 1980.

Respondent was taken into custody on 12 December 1979 following a determination by the Assistant Clerk of Superior Court that respondent was probably mentally ill and dangerous

to himself or others. This determination was based on a petition for the involuntary commitment of respondent initiated by James D. Collins, the respondent's father.

At the hearing held on 20 December 1979 the petitioner offered the testimony of two physicians and respondent's parents. Dr. Selwyn Rose, a psychiatrist at Reynolds Health Center, testified that based on his "mental status" examination of the respondent lasting approximately thirty minutes on 18 December 1979, Dr. Rose believed that respondent was suffering from paranoid schizophrenia and was dangerous to himself and others. Dr. Rose explained that he administered no psychological tests on the respondent and that he spoke with no one other than respondent to obtain respondent's medical history. Dr. Rose testified that his opinions were based on respondent's flattened affect[1], strange thinking, impaired judgment and lack of insight into his own problem. The respondent was dangerous according to Dr. Rose because unpredictability is one of the hallmarks of paranoid schizophrenia.

Dr. H. Ezell Branham, a psychiatrist, testified that in his opinion the respondent was dangerous to himself and others. Dr. Branham based his opinion on an examination of respondent at Reynolds Memorial Hospital on 13 December 1979 and respondent's history as related to Dr. Branham by a resident at the hospital. Dr. Branham recalled observing respondent's flatness of affect during the examination, but Dr. Branham could not supply specific instances of such behavior by respondent. Respondent's history included reports of respondent's belief that demons were chasing him and of respondent's difficulty sleeping.

Respondent's parents testified that respondent kept a long iron pipe and a hatchet under his bed and that respondent had intentionally cut himself on the hand with a knife a few weeks prior to 12 December. Respondent also had threatened his mother three days prior to 12 December and forced her to sit in

---

[1]"Affect" in the language of psychiatry is defined as follows: "1. Emotion regarded as an influence on the state of mind; the feeling of pleasantness or unpleasantness resulting from a particular stimulus. 2. Mood; feeling; the feeling associated with a particular type of emotion. A *flat* affect is a diminished outward emotional reaction to a stimulus or situation." 1 Schmidt's Attorneys' Dictionary of Medicine, p. A-98 (1980).

In re Collins

a chair for two hours. There was testimony that respondent had been observed in the woods with a rope around his neck and that respondent complained of demons and of feeling that his bones were being pulled out. His parents testified as to other recent episodes of erratic or irrational behavior.

Respondent's evidence tended to show that he had never actually struck anyone and that he had been generally cooperative with his parents. Respondent also offered testimony in explanation of the incidents and events testified to by his parents. On cross-examination respondent testified that the demons that occasionally attacked him were "brutally cruel" and that they gave him no peace.

After hearing the evidence the trial judge issued the following order for involuntary commitment.

> The Court finds as fact from clear, cogent and convincing evidence that the respondent is mentally ill and dangerous to himself and to others;

> The facts supporting such finding are as follows: Within the recent past the person has acted in such manner as to evidence that he would be unable without care, supervision and the continued assistance of others not otherwise available, to exercise self-control, judgment and discretion in the conduct of his daily responsibilities and social relations; satisfy his need for nourishment, personal or medical care, shelter or self-protection and safety; and that there is a reasonable probability of serious physical debilitation to him within the near future unless adequate treatment is afforded.

> Within the recent past the respondent has threatened suicide and threatened his mother with harm . . . .

In the order of commitment, the trial judge also recorded and found as supporting facts the testimony of petitioner's witnesses detailed above. The order provided that respondent be involuntarily committed as an in-patient at Umstead Hospital for a period not to exceed ninety days. Respondent appeals from this order challenging the sufficiency of the evidence to support the trial judge's findings that respondent was mentally ill and dangerous to himself and to others.

*Attorney General Rufus L. Edmisten, by Assistant Attorney General Nonnie F. Midgette, for the State.*

*Robert F. Johnson for the respondent appellant.*

WELLS, Judge.

[1] We note at the outset that respondent's unconditional discharge on 8 January 1980 does not moot this appeal. *In re Hatley,* 291 N.C. 693, 694-95, 231 S.E. 2d 633, 634-35 (1977); *In re Mackie,* 36 N.C. App. 638, 244 S.E. 2d 450 (1978).

To enter the commitment order the trial court was required to ultimately find two distinct facts, *i.e.,* that the respondent was mentally ill and was dangerous to himself or to others. G.S. 122-58.1; *see In re Doty,* 38 N.C. App. 233, 234, 247 S.E. 2d 628, 629 (1978). The trial court must determine that each finding is supported by clear, cogent and convincing evidence. G.S. 122-58.7(i). In its order the trial court must record the facts upon which its ultimate findings are based. *Id.; In re Jacobs,* 38 N.C. App. 573, 575, 248 S.E. 2d 448, 449 (1978).

[2] On appeal of a commitment order our function is to determine whether there was *any* competent evidence to support the "facts" recorded in the commitment order and whether the trial court's ultimate findings of mental illness and dangerous to self or others were supported by the "facts" recorded in the order. *In re Underwood,* 38 N.C. App. 344, 347-48, 247 S.E. 2d 778, 781 (1978); *In re Hogan,* 32 N.C. App. 429, 433, 232 S.E. 2d 492, 494 (1977). We do not consider whether the evidence of respondent's mental illness and dangerousness was clear, cogent and convincing. It is for the trier of fact to determine whether the competent evidence offered in a particular case met the burden of proof. *In re Underwood, supra,* at 347, 247 S.E. 2d at 781.

In the case *sub judice,* respondent contends that some of the evidence offered by petitioner was incompetent and that the remaining competent evidence was insufficient to support the facts recorded in the commitment order. Respondent also contends that the recorded facts were insufficient to justify the ultimate findings of respondent's mental illness and dangerousness. We disagree with both contentions.

Respondent first challenges the competency of the opinion evidence offered by petitioner's two expert witnesses, objecting

In re Collins

to such expert witness testimony on two grounds. First respondent correctly states that competent expert testimony must be based on sufficient data and not mere conjecture or speculation. *Dean v. Coach Co.*, 287 N.C. 515, 522, 215 S.E. 2d 89, 94 (1975). Respondent also correctly argues that the premises underlying an expert's opinion must be made known to the trier of fact in order that the trier of fact may properly evaluate the opinion. *Schafer v. R.R.*, 266 N.C. 285, 288-89, 145 S.E. 2d 887, 890 (1966); *Service Co. v. Sales Co.*, 259 N.C. 400, 414, 131 S.E. 2d 9, 20 (1963). Thus respondent questions whether the short mental status examinations given to the respondent by each physician provided sufficient data to support the witnesses' expert opinions, and whether each physician's testimony adequately informed the trier of fact of that supporting data. In involuntary commitment proceedings our appellate courts have on occasion rejected psychiatric opinion evidence on both grounds mentioned above (lack of sufficient data on which to base an expert opinion, *In re Hatley, supra,* at 699; expert's stated premises fail to justify stated conclusion, *In re Hogan, supra,* at 434).

[3]  We hold that Dr. Rose's interview with respondent, though brief, is adequate to remove his opinion from the realm of mere conjecture or speculation. The special value of expert testimony is the ability of the expert to draw inferences which the finder of fact is incompetent to draw, McCormick, Evidence § 13, p. 29 (2d ed. 1972), therefore the finder of fact cannot always be expected to fully understand the basis of the expert's inferences even if the expert testifies at great length. *See Rutherford v. Air Conditioning Co.*, 38 N.C. App. 630, 639, 248 S.E. 2d 887, 894 (1978). Psychiatric evidence should not be excluded merely because the basis for such inferences seems less than compelling to the trier of fact.

> The law must recognize that the usefulness of psychiatric evidence is not determined by the exactness or infallibility of the witness' science. Rather, it is measured by the probability that what he has to say offers more information and better comprehension of the human behavior which the law wishes to understand. The psychiatrist offers a hypothesis explaining a specific set of human thoughts, feelings, and actions. He then attaches values to the phenomena he describes: certain feelings are "normal," certain thoughts or actions are "pathological," cer-

tain behavior is "compulsive," other behavior is "free," etc. The legal usefulness of such hypotheses and values will depend less upon their scientific precision than upon their wisdom.

Diamond & Louisell, *The Psychiatrist as an Expert Witness: Some Ruminations and Speculations,* 63 Mich. L. Rev. 1335, 1341 (1965). It is for the trier of fact to determine the amount of wisdom in and the amount of weight to be given to the competent psychiatric evidence.

[4] We now address the question of whether the evidence supported the trial court's finding of fact that respondent was dangerous to himself and others. The statutory provisions as to this requisite finding have undergone recent changes. With the enactment of Chapter 1408 of the 1973 Session Laws, effective 12 June 1974, the General Assembly rewrote the pertinent provisions of Article 5A of Chapter 122 in pertinent part as follows:

§ 122-58.1. Declaration of policy. — It is the policy of the State that no person shall be committed to a mental health facility unless he is mentally ill or an inebriate and imminently dangerous to himself or others . . . .

§ 122-58.2. Definitions. — As used in this Article:

. . .

(c) The phrase 'dangerous to himself'[2] includes, but is not limited to, those mentally ill or inebriate persons who are unable to provide for their basic needs for food, clothing, or shelter . . . .

. . . .

§ 122-58.7. District court hearing. —

. . . .

(i) To support a commitment order, the court is required to find, by clear, cogent, and convincing evidence, that the respondent is mentally ill or inebriate, and imminently dangerous to himself or others . . . .

[2]The 1973 Revision contains no definition of the term "dangerous to others."

The enactment of Chapter 915 of the 1979 Session Laws of the General Assembly completely rewrote G.S. 122-58.2, quoted below, to redefine the term "dangerous to himself," and to provide for the first time a statutory definition of the term "dangerous to others." The entire section as amended now provides as follows:

§ 122-58.2. Definitions. — As used in this Article:

(1) The phrase "dangerous to himself or others" when used in this Article is defined as follows:

a. "Dangerous to himself" shall mean that within the recent past:

1. The person has acted in such manner as to evidence:

I. That he would be unable without care, supervision, and the continued assistance of others not otherwise available, to exercise self-control, judgment, and discretion in the conduct of his daily responsibilities and social relations, or to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety; and

II. That there is a reasonable probability of serious physical debilitation to him within the near future unless adequate treatment is afforded pursuant to this Article. A showing of behavior that is grossly irrational or of actions which the person is unable to control or of behavior that is grossly inappropriate to the situation or other evidence of severely impaired insight and judgment shall create a prima facie inference that the person is unable to care for himself; or

2. The person has attempted suicide or threatened suicide and that there is a reasonable probability of suicide unless

adequate treatment is afforded under this Article; or

3. The person has mutilated himself or attempted to mutilate himself and that there is a reasonable probability of serious self-mutilation unless adequate treatment is afforded under this Article.

b. "Dangerous to others" shall mean that within the recent past, the person has inflicted or attempted to inflict or threatened to inflict serious bodily harm on another or has acted in such a manner as to create a substantial risk of serious bodily harm to another and that there is a reasonable probability that such conduct will be repeated.

By the same enactment, the General Assembly amended G.S. 122-58.1 and G.S. 122-58.7(i) to delete the word "imminently" in conjunction with the use of the word "dangerous". The present requirement, therefore, is for the District Court to find that the respondent is dangerous to himself and others; and the additional finding that the danger to himself or others is imminent, *see In re Hogan*, 32 N.C. App. 429, 232 S.E. 2d 492 (1977); *In re Salem*, 31 N.C. App. 57, 228 S.E. 2d 649 (1976); *In re Carter*, 25 N.C. App. 442, 213 S.E. 2d 409 (1975), is no longer required.

Having found that there was competent evidence to support the facts recorded in the order, we now consider and reject respondent's contention that the recorded facts do not support the ultimate findings of mental illness and dangerousness to self or others. The testimony of respondent's parents that he deliberately cut himself with a knife and deliberately exposed himself to danger by sitting on the edge of a busy airport runway supports the finding that respondent was dangerous to himself. His parents' testimony that he kept an iron pipe and a hatchet under his bed and that through threats required his mother to sit in one chair and not move for two hours while he was screaming, shouting, and cursing and that he threatened to "bust" his mother's head if she called anybody supports the finding that he was dangerous to others. We hold that the facts recorded in the order are clearly sufficient to support the trial judge's conclusions.

Maddox v. Insurance Co.

We hold that the order of the trial court must be and is Affirmed.

Judges ARNOLD and ERWIN concur.