IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-652

Filed: 17 March 2020

Granville County, No. 18SPC50670

In the Matter of N.U.

Appeal by Respondent from order entered 17 January 2019 by Judge Adam S. Keith in Granville County District Court. Heard in the Court of Appeals 19 February 2020.

*Attorney General Joshua H. Stein, by Assistant Attorney General John Tillery, for the State-Appellee.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender Katy Dickinson-Schultz, for the Respondent-Appellant.*

COLLINS, Judge.

Respondent N.U. appeals from an involuntary commitment order committing her to inpatient treatment, followed by outpatient treatment. Respondent argues that the trial court erred because neither the evidence nor the findings of fact supported the trial court's conclusion that Respondent was dangerous to herself. As neither the record evidence nor the findings support the trial court's conclusion that Respondent was dangerous to herself, we reverse the trial court's involuntary commitment order.

**I.  Background**

On 5 November 2018, Respondent presented in the emergency department at UNC Rex Healthcare. Dr. Jun He, the physician on call in the emergency department on 5 November 2018, observed Respondent's behavior and became concerned for her mental health. Dr. He filed an affidavit and petition for involuntary commitment, affirming that Respondent was "mentally ill and dangerous to self" as she has schizoaffective disorder, presented in the emergency department with "bizarre, disorganized behavior," and stated that Respondent was "aggressive (kicking, spitting, hitting the staff)" and "adamantly refuse[d] to take any medication, . . . [and] has no insight of her mental illness."

That same day, Respondent underwent an "Examination and Recommendation to Determine Necessity for Involuntary Commitment" ("ERIC"). Dr. He found that Respondent "presented with bizarre, aggressive behaviors . . . , she continues to be psychotically paranoid and aggressive, has NO insight, refused all her medication, [and] thus needs to . . . be referred to inp[atient] psych[iatric] hospital." Dr. He recommended that Respondent be committed inpatient for seven days. Following the ERIC, a magistrate judge ordered Respondent to be committed inpatient at Central Regional Hospital.

On 8 November 2018, UNC Rex Healthcare transferred Respondent to the care of Central Regional Hospital. On 8 and 9 November, Respondent underwent two more ERICs. After the 9 November ERIC, Dr. Stephen Panyko, a physician with

Central Regional Hospital, determined that Respondent has "multiple past psychiatric admissions, including 3 admissions to N.C. state hospitals within the past year," and that she had "threatened staff [at UNC Rex Healthcare], . . . and required [forced] meds and mechanical restraints. She continues to be paranoid, verbally aggressive, . . . [and] is at high risk of harm to self and others . . . ." Panyko recommended that Respondent be committed for inpatient treatment for 60 days and committed for outpatient treatment for 30 days.

On 15 November 2018, the trial court found that Respondent was mentally ill and dangerous to herself and others, and ordered Respondent committed for inpatient treatment for 60 days and committed for outpatient treatment for 30 days. Respondent did not appeal this commitment order.

On 4 January 2019, Respondent underwent another ERIC at Central Regional Hospital. It was determined that Respondent has "schizophrenia" and that "continued hospitalization is warranted as [she] has little insight and is at risk for decompensation without medication, as she has a history of repeated hospitalizations this past year, as such she represents a danger to herself." On 9 January 2019, Dr. Christina Murray filed the ERIC and recommended that Respondent be committed for inpatient treatment for an additional 30 days and committed for outpatient treatment for an additional 60 days.

The recommitment hearing took place on 17 January 2019. Panyko was admitted as an expert in psychiatry and testified as Respondent's attending physician. Panyko testified to Respondent's history of commitments, her behavior and progress while committed for inpatient treatment, explained that he had completed a petition for guardianship, and that the guardianship hearing would take place in February 2019. Panyko also testified that Respondent was "stable" as of 17 January 2019 and was not experiencing any "acute paranoia or agitation."

Following Panyko's testimony, Respondent's attorney made a motion to dismiss, arguing that Respondent no longer met the criteria listed in N.C. Gen. Stat. § 122C. Respondent then took the stand to testify on her own behalf. She affirmed that she had secure housing, was taking her medication and would continue to take her medication once released, and that she was willing to see a doctor and receive outpatient treatment upon release. She also explained that she had stopped taking her medication in the past due to homelessness and because she did not have a doctor who would prescribe the medications for her. Respondent acknowledged that her past commitments had been based on her failure to take her necessary medications. Respondent's attorney renewed the motion to dismiss and again argued that Respondent no longer met the criteria listed in § 122C because Respondent was "at baseline, she is stable, and she is not acute." The trial court denied Respondent's motion.

The trial court made oral findings of fact that (1) Respondent lacked insight into her mental illness; (2) Respondent had four psychiatric stays within the past two years and which all resulted in readmission; (3) within the relevant past, Respondent had been unable to care for herself and stay on her medication; and (4) there was a reasonable probability that Respondent would suffer "serious physical debilitation within the near future unless continued adequate treatment is given." The trial court concluded that Respondent was mentally ill and a danger to herself. The trial court incorporated the oral findings of fact into its written order, and ordered Respondent committed inpatient for 30 days and committed outpatient for 60 days.

That same day, on 17 January 2019, Respondent appealed the recommitment order.

## II. Discussion

Respondent argues that the trial court erred by involuntarily committing her when neither the evidence nor the trial court's findings of fact supported the conclusion that she was dangerous to herself.

As an initial matter, we note that Respondent's appeal is not moot although her commitment period has lapsed because "'the challenged judgment may cause collateral legal consequences for the appellant.'" *In re J.P.S.*, 823 S.E.2d 917, 920 (N.C. Ct. App. 2019) (quoting *In re Booker*, 193 N.C. App. 433, 436, 667 S.E.2d 302, 304 (2008)). "Such collateral legal consequences might include use of the judgment

to attack the capacity . . . of a defendant . . . or to form the basis for a future commitment[,]" and thus the appeal is properly before this Court for review. *Id.*

"To support an involuntary commitment order, the trial court is required to 'find two distinct facts by clear, cogent, and convincing evidence: first that the respondent is mentally ill, and second, that he is dangerous to himself or others.'" *In re W.R.D.*, 248 N.C. App. 512, 515, 790 S.E.2d 344, 347 (2016) (quoting *In re Lowery*, 110 N.C. App. 67, 71, 428 S.E.2d 861, 863-64 (1993)). "These two distinct facts are the 'ultimate findings' on which we focus our review." *Id.* (citation omitted). These ultimate findings, standing alone, are insufficient to support the trial court's order; the trial court must also "record the facts upon which its ultimate findings are based." *In re Collins*, 49 N.C. App. 243, 246, 271 S.E.2d 72, 74 (1980); N.C. Gen. Stat. § 122C-268(j) (2019). We must "determine whether there was any competent evidence to support the facts recorded in the commitment order and whether the trial court's ultimate findings of mental illness and dangerous to self . . . were supported by the facts recorded in the order." *Id.* (internal quotation marks and emphasis omitted).

N.C. Gen. Stat. § 122C-3(11) provides, in relevant part, that a person is dangerous to himself if, within the relevant past, he has acted in such a way as to show:

> I. That he would be unable, without care, supervision, and the continued assistance of others not otherwise available, to exercise self-control, judgment, and discretion in the conduct of his daily responsibilities and social relations, or

to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety; and

II.  That there is a reasonable probability of his suffering serious physical debilitation within the near future unless adequate treatment is given pursuant to this Chapter.  A showing of behavior that is grossly irrational, of actions that the individual is unable to control, of behavior that is grossly inappropriate to the situation, or of other evidence of severely impaired insight and judgment shall create a prima facie inference that the individual is unable to care for himself . . . .

N.C. Gen. Stat. § 122C-3(11)(a)(1) (2019).[1]

Here, the trial court's written findings of fact stated that:

1. The Respondent has had 4 seperate [sic] state psychiatric hospitalizations within the relevant past.
2. She is unable to care for herself for daily responsibilities and taking medications.
3. The Respondent would likely decompensate if discharged today.
4. She has the mental illness of schizophrenia.

The trial court also incorporated by reference any oral findings and facts made during the hearing.  The trial court's oral findings were that (1) Respondent lacked insight into her mental illness; (2) Respondent had four psychiatric stays within the past two years and which all resulted in readmission; (3) within the relevant past, Respondent had been unable to care for herself and stay on her medication; and (4) there was a

---

[1] Subsection 11(a) was amended effective 1 October 2019 to alter pronouns and word choice. 2019 N.C. Sess. Laws ch. 76, § 1.  We apply and quote in this opinion the version of the statute extant at the time the trial court conducted the hearing.  We note that the 2019 amendment made no substantive change to the relevant portions of the statute.

reasonable probability that Respondent would suffer "serious physical debilitation within the near future unless continued adequate treatment is given."

The findings that Respondent "would likely decompensate if discharged today" and that there was a reasonable probability that Respondent would suffer "serious physical debilitation within the near future unless continued adequate treatment was given" are not supported by any evidence in the record. Panyko testified about Respondent's history of mental illness and prior noncompliance, but stated that as of the hearing date, Respondent "has gotten stable enough we've actually been able to decrease her oral dose a little bit and are in the process of potentially still being able to do that." Panyko then stated, "I believe that she is [at her baseline] . . . . She is stable." Panyko testified that he still recommended 30 days inpatient commitment for Respondent because it would "get us . . . importantly through the guardianship hearing, which . . . is February 7th."

On cross-examination, Respondent's attorney asked Panyko to explain how Respondent was a danger to herself when his testimony was that she was stable and not acute. Panyko replied that, in the past, "[Respondent] has stopped taking medications . . . and become dangerous to herself." When questioned as to whether Respondent was acute or a danger to herself "at this present time," Panyko answered, "[T]he patient's symptoms have been well treated . . . . She's not having acute paranoia or agitation at this time." And that Respondent "[was stabilized] within the

past three weeks or so" to the extent that she was "able to start to come down on that dose [of haldol]."

Panyko's testimony shows that, as of the hearing date, Respondent was stabilized, medicated, and not suffering from any acute symptoms. While evidence of Respondent's mental illness and involuntary commitment history show that she had been a danger to herself in the past, that history alone cannot support a finding that Respondent would be a danger to herself in the future. *See In re Whatley*, 224 N.C. App. 267, 273, 736 S.E.2d 527, 531 (2012) (determining that respondent's history of bipolar disorder and prior involuntary commitments failed to show that she would be a danger to herself within the future). After reviewing Panyko's testimony and Respondent's testimony, there is no record evidence to support the findings that Respondent "would likely decompensate if discharged today" or that there was a reasonable probability that Respondent would suffer "serious physical debilitation within the near future unless continued adequate treatment was given." Thus, those findings cannot support the trial court's ultimate finding that Respondent was dangerous to herself.

The trial court's findings that Respondent has "had four . . . psychiatric stays" within the past two years and that she "has the mental illness of schizophrenia" do not support the conclusion she would be a danger to herself "within the near future." *Id.* Similarly, the findings that Respondent lacks "insight into her mental illness"

and is "unable to care for herself for daily responsibilities and taking medications" are also insufficient to show that Respondent was a danger to herself as there is "no evidence that Respondent's refusal to take [her] medication creates a serious health risk in the near future." *See W.R.D.*, 248 N.C. App. at 516, 790 S.E.2d at 348 (determining that findings that respondent "refus[ed] to acknowledge his mental illness, and refus[ed] to take his prescription medication" did not demonstrate "that the health risk will occur in the near future . . . .") (internal quotation marks and citation omitted).

### III. Conclusion

As neither the record evidence nor the findings of fact support the trial court's conclusion that Respondent was dangerous to herself, we reverse the trial court's involuntary commitment order.

REVERSED.

Judges DIETZ and MURPHY concur.