IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-789

Filed: 17 March 2020

Mecklenburg County, No. 19 SPC 2591

In re B.S.

Appeal by Respondent from order entered 3 April 2019 by Judge Elizabeth Trosch in Mecklenburg County District Court. Heard in the Court of Appeals 4 February 2020.

*Attorney General Joshua H. Stein, by Assistant Attorney General Milind K. Dongre, for the State-Appellee.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender Wyatt Orsbon, for the Respondent-Appellant.*

COLLINS, Judge.

Respondent B.S. appeals from an involuntary commitment order committing him to inpatient treatment, followed by outpatient treatment. Respondent argues (1) that the trial court's findings of fact fail to support its conclusion that Respondent was dangerous to himself and dangerous to others and (2) that the trial court violated N.C. Gen. Stat. § 122C-271(b)(2) when it ordered a split commitment that exceeded the maximum authorized period of 90 days of commitment. As to Respondent's first argument, we affirm. As to the second argument, we remand for entry of a

commitment period that complies with the statutory mandate of a maximum of 90 days' commitment.

## I. Procedural History

On 15 March 2019, an affidavit and petition for involuntary commitment was presented to a Mecklenburg County magistrate alleging that Respondent was (1) mentally ill and dangerous to self or others and (2) a substance abuser and dangerous to self or others. The affidavit and petition stated that Respondent was (1) abusing alcohol and marijuana; (2) diagnosed with "schizoaffective disorder-bipolar" and was not taking his medications; (3) saying inappropriate things to children and neighbors; (4) breaking into vehicles in his neighborhood; and (5) dragging his dog through the neighborhood causing it injury and telling the dog to bite others. That same day, the magistrate found that both grounds were supported by the factual allegations and ordered Respondent into custody so that an examination could be completed within 24 hours at Behavioral Health Charlotte ("BHC"). On 16 March 2019, Dr. S. Solimon, a psychologist with BHC, conducted an examination of Respondent to determine the necessity for involuntary commitment. Solimon determined Respondent to be dangerous to himself and others, and recommended 30 days' inpatient commitment.

On 3 April 2019, the trial court conducted an involuntary commitment hearing for Respondent. At the conclusion of the hearing, the trial court ordered Respondent committed to inpatient treatment at BHC or Broughton Hospital for a period not to

exceed 30 days, followed by a commitment to outpatient treatment at BHC or Broughton Hospital for a period not to exceed 90 days.

Respondent gave verbal notice of appeal in open court on 3 April 2019 and filed written notice of appeal on 22 April 2019.

## II. Factual Background

Dr. David Litchford, a psychiatrist with BHC, testified at the involuntary commitment hearing to Respondent's mental health history. He testified that Respondent has "schizo-affective disorder" and that he was "well-known" at BHC because he had previously been admitted at least six times. Respondent was admitted at least five additional times to Old Vineyard Hospital, Rowan Hospital, and Broughton Hospital. Litchford testified that Respondent had been "very aggressive" during a previous commitment hearing, and "assaultive" after that commitment hearing, and had to be transferred to Broughton Hospital, where he remained for two years. Respondent was discharged from Broughton Hospital in January 2019 but had to be admitted to BHC on 15 March 2019 for medication noncompliance.

Litchford testified that when Respondent was admitted to the BHC emergency room on 15 March 2019, he was very angry. Respondent hit his fists on the walls, exposed himself to hospital staff, threatened to urinate on the floor, claimed that he was raped in the Emergency Room, and claimed that "he [did] not know who [B.S.]

is." Respondent claimed to be "Brian Mohammad Allah Gomez." Respondent said that he "has never been aggressive towards people, he's never been assaultive, that he's never been psychiatrically hospitalized before and never been required to take psychiatric medication or had a diagnosis." Litchford explained that Respondent's denial of his identity "persists through today."

Litchford explained that Respondent is "delusional[,] . . . grandiose and paranoid." Respondent told his psychiatrist that he was hospitalized "because the government—the United States government is trying to intimidate him to prevent his political campaign of globalism." He made numerous phone calls to customer care hotlines and claimed that he had been abused and neglected at BHC. He also wrote letters to the customer care hotlines, stating that he was "fearful for [his] life" and claiming that Litchford told him, "You're going to be here a while because I said, and that's all that matters. I own you. You're mine and might as well call me master[.]" Litchford testified that this was "never, ever vocalized" to Respondent.

Respondent had to be forcibly medicated while at BHC due to his anger and aggression towards the hospital staff. He was "manic with pressured speech, high energy, not sleeping. He was intrusive, demanding." Given his "history of volatility," hospital staff placed Respondent on forced injection and forced tablet medications. When Litchford asked Respondent if he would commit to taking the medications after release from BHC, he "ple[]d the fifth" and stated that he does not have a mental

illness and does not need the medication. Litchford concluded that, as of the date of the hearing, Respondent "remains very angry, irritated, and defensive[;] . . . [and] extremely psychotic and . . . unpredictable at this time."

Respondent testified at the hearing and requested that federal authorities verify his identity through a DNA test. He explained that he has "three twins. Three identical triplet twins. I am a quadruplet[,]" and asked the trial court to determine the legitimacy of his identity. Respondent testified that he refused medication because he did not believe it was right or medically just to be injected with needles, and stated that he had not been harmful to himself or to others.

## III. Discussion

*1. Dangerous to Self and Others*

Respondent first argues that the facts recorded in the trial court's commitment order do not support its ultimate findings that he is dangerous to himself and dangerous to others.

"To support an inpatient commitment order, the court shall find by clear, cogent, and convincing evidence that the respondent is mentally ill and dangerous to self . . . or dangerous to others . . . ." N.C. Gen. Stat. § 122C-268(j) (2019). Findings of mental illness and dangerousness to self are ultimate findings of fact. *In re Collins*, 49 N.C. App. 243, 246, 271 S.E.2d 72, 74 (1980). This Court reviews an involuntary commitment order to determine whether the ultimate findings of fact are supported

by the trial court's underlying findings of fact and whether those underlying findings, in turn, are supported by competent evidence. *In re W.R.D.*, 248 N.C. App. 512, 515, 790 S.E.2d 344, 347 (2016); *Collins,* 49 N.C. App. at 246, 271 S.E.2d at 74. Unchallenged findings of fact are "presumed to be supported by competent evidence and [are] binding on appeal." *In re Moore*, 234 N.C. App. 37, 43, 758 S.E.2d 33, 37 (2014) (citation omitted). On appeal, "[w]e do not consider whether the evidence of respondent's mental illness and dangerousness was clear, cogent, and convincing. It is for the trier of fact to determine whether the competent evidence offered in a particular case met the burden of proof." *Collins*, 49 N.C. App. at 246, 271 S.E.2d at 74.

N.C. Gen. Stat. § 122C-3 provides, in relevant part, that a person is dangerous to himself if, within the relevant past, he has acted in such a way as to show:

> I. That he would be unable, without care, supervision, and the continued assistance of others not otherwise available, to exercise self-control, judgment, and discretion in the conduct of his daily responsibilities and social relations, or to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety; and
>
> II. That there is a reasonable probability of his suffering serious physical debilitation within the near future unless adequate treatment is given pursuant to this Chapter. A showing of behavior that is grossly irrational, of actions that the individual is unable to control, of behavior that is grossly inappropriate to the situation, or of other evidence of severely impaired insight and judgment shall create a prima facie inference that the individual is unable to care for himself . . . .

N.C. Gen. Stat. § 122C-3(11)(a)(1) (2019).[1]

Subsection 11(a)(1)(II) prohibits a trial court from involuntarily committing a person based only on a finding that the person had a history of mental illness or behavior before the commitment hearing; the trial court must find that there is a reasonable probability of some harm in the near future if the person is not treated. *In re J.P.S.*, 823 S.E.2d 917, 921 (N.C. Ct. App. 2019). "Although the trial court need not say the magic words 'reasonable probability of future harm,' it must draw a nexus between past conduct and future danger." *Id.* (citing *In re Whatley*, 224 N.C. App. 267, 273, 736 S.E.2d 527, 531 (2012)).

A person is dangerous to others if,

> [w]ithin the relevant past, the individual has inflicted or attempted to inflict or threatened to inflict serious bodily harm on another, or has acted in such a way as to create a substantial risk of serious bodily harm to another, or has engaged in extreme destruction of property; and that there is a reasonable probability that this conduct will be repeated. Previous episodes of dangerousness to others, when applicable, may be considered when determining reasonable probability of future dangerous conduct. . . .

N.C. Gen. Stat. § 122C-3(11)(b) (2019).

In *In re Zollicoffer*, 165 N.C. App 462, 598 S.E.2d 696 (2004), this Court determined that the trial court's ultimate finding of dangerousness to self was

---

[1] Subsection 11(a) was amended effective 1 October 2019 to alter pronouns and word choice. 2019 N.C. Sess. Laws ch. 76, § 1. We apply and quote in this opinion the version of the statute extant at the time the trial court conducted the hearing. We note that the 2019 amendment made no substantive change to the relevant portions of the statute.

supported by the underlying findings. Based on a treating physician's examination and recommendation, the trial court found

> that respondent has a history of chronic paranoid schizophrenia, that respondent admits to medicinal non-compliance which puts him "at high risk for mental deterioration," that respondent does not cooperate with his treatment team, and that he "requires inpatient rehabilitation to educate him about his illness and prevent mental decline."

*Id.* at 469, 598 S.E.2d at 700. Explaining that "the failure of a person to properly care for his/her medical needs, diet, grooming and general affairs meets the test of dangerousness to self[,]" *id.* (quoting *In re Lowery*, 110 N.C. App. 67, 72, 428 S.E.2d 861, 864 (1993) (internal quotation marks omitted)), we concluded that the findings of fact supported the conclusion of law that respondent was dangerous to himself. *Id.*

In this case, the trial court made the following relevant findings of fact:

> Since respondent presented in the emergency department, he has acted in such a way as to show that he is unable without constant professional 24 hour supervision and medical treatment to exercise self-control, judgment and discretion in the conduct of his daily responsibilities and social relations to satisfy his need for nourishment, personal or medical care, self protection and safety and is likely to suffer debilitation without treatment. His behavior, during his admission, has been grossly irrational and he has demonstrated severely impaired insight and judgment.
> Respondent has been admitted to this facility on six prior occasions for acute psychiatric treatment; three times to Broughton Hospital and twice to other facilities for psychiatric treatment. He was admitted to Broughton Hospital after being assaultive during an involuntary commitment hearing. He remained in the hospital for two

years and was discharged in January 2019. Since that discharge, over the subsequent two months, Respondent did not engage in treatment or take prescribed medication resulting in a rapid deterioration of his mental status. Respondent is grossly delusional, paranoid and manic. He has been at all times during this admission, angry, agitated and defensive.

Respondent has been intrusive which risks substantial conflict and risk of harm outside the medical facility. Respondent denies his identity. He denies ever being diagnosed with a mental illness, being prescribed medication or being treated at this or any other psychiatric treatment facility. Respondent denies he is [B.S.] unless there is DNA evidence to prove this.

The trial court also found as fact and incorporated by reference all matters set out in Solimon's examination report on Respondent and Litchford's testimony, discussed in Section I. *supra*. Solimon conducted an examination of Respondent in order to determine any necessity for involuntary commitment. Solimon concluded that Respondent has schizoaffective disorder, was dragging his dog around the neighborhood and ordering the dog to bite people, was "alleged to be breaking into cars," and that his "loss of touch with reality makes it difficult for him to exercise judgment in the conduct of his daily affairs."

As in *In re Zollicoffer*, these findings of fact are sufficient to support an ultimate finding that Respondent was dangerous to himself and that there was a "reasonable probability" of near-future harm, as required by N.C. Gen. Stat. § 122C-3(11)(a)(1)(I-II). *Zollicoffer*, 165 N.C. App. at 469, 598 S.E.2d at 700. The trial court's findings that (1) Respondent is unable "without constant professional 24 hour

supervision and medical treatment" to satisfy his needs for personal or medical care, self-protection, and safety; (2) Respondent is "grossly delusional, paranoid, and manic[,]" and "is likely to suffer debilitation without treatment"; (3) Respondent's "loss of touch with reality makes it difficult for him to exercise judgment in the conduct of his daily affairs"; and (4) Respondent is "at risk of harm outside the medical facility[,]" show that Respondent was dangerous to himself and that there was a reasonable probability that he would suffer imminent harm absent commitment.

Moreover, the trial court's findings that Respondent was "grossly irrational," "demonstrated severely impaired insight and judgment," and was "extremely psychotic" as of the hearing date show that Respondent was unable to care for himself, and thus likely to suffer harm in the near future, without treatment. These findings support that Respondent was unable "to properly care for his[] medical needs . . . and general affairs," and they thus "meet[] the test of dangerousness to self." *Lowery*, 110 N.C. App. at 72, 428 S.E.2d at 864.

Under N.C. Gen. Stat. § 122C-3(11), the trial court need only determine that a respondent is dangerous to themselves *or* dangerous to others to support commitment. Here, the findings sufficiently support the trial court's ultimate determination that Respondent was dangerous to himself, and thus we need not determine whether the findings of fact adequately support that Respondent was dangerous to others.

2. *Maximum Commitment of 90 Days*

Respondent next argues that the trial court erred by imposing a split commitment that exceeded the maximum statutory period of 90 days.

As a preliminary matter, we first address the State's argument that Respondent's appeal of the commitment period is moot because "the commitment order . . . expired, . . . [and] no longer involves the kind of question challenging the involuntary commitment proceeding[.]" The State claims that Respondent essentially asks for the trial court "to retrieve the original order from the clerk's office, strike out the '90 days' ordered for outpatient commitment, enter some number between 1 and 60 . . . and then store the case file away again." The State further argues that Respondent waived appellate review when he failed to object at trial to the length of the commitment. We determine the State's claims to be meritless.

"When a statute is clearly mandatory, and its mandate is directed to the trial court, the statute automatically preserves statutory violations as issues for appellate review." *In re E.D.*, 372 N.C. 111, 117, 827 S.E.2d 450, 454 (2019) (internal quotation marks and citations omitted). In *In re Carter*, 25 N.C. App. 442, 213 S.E.2d 409 (1975), this Court explained that

> the statute expressly provides that appeal may be had from a judgment of involuntary commitment in the district court to this court, as in civil cases. Since the statute also directs that the initial period of commitment may not exceed 90 days, . . . there would be little reason to provide a right of appeal if the appeal must be considered moot solely

> because the period of commitment expires before the appeal can be heard and determined in this court.

*Id.* at 444, 213 S.E.2d at 410. "[I]n order to challenge the improper commitment period contained in the . . . order, [Respondent] was required to appeal that [] order pursuant to N.C. Gen. Stat. § 122C–272 . . . ." *In re Webber*, 201 N.C. App. 212, 222, 689 S.E.2d 468, 476 (2009). Thus, an improper commitment period constitutes reversible error. *Id.* at 218, 689 S.E.2d at 473. ("By statute, the court was only authorized to order commitment . . . for 90 days . . . ."). Respondent's appeal of the length of his commitment is properly before this Court.

N.C. Gen. Stat. § 122C-271 provides that a trial court "may order outpatient commitment for a period not in excess of 90 days[,]" "may order inpatient commitment at a 24-hour facility . . . for a period not in excess of 90 days[,]" or "may order a combination of inpatient and outpatient commitment . . . for a period not in excess of 90 days." N.C. Gen. Stat. § 122C-271 (2019). Whether a trial court orders inpatient treatment, outpatient treatment, or a combination of both, the maximum commitment period cannot exceed 90 days. *Id.*

Here, the trial court committed Respondent to 30 days of inpatient treatment and 90 days of outpatient treatment, for a total commitment period of 120 days. This it could not do. As the trial court impermissibly ordered a commitment period in excess of the maximum allowed by N.C. Gen. Stat. § 122C-271, we reverse the 120-day commitment period ordered in this case.

## III.  Conclusion

As the trial court's findings of fact supported the ultimate finding that Respondent was a danger to himself, the trial court did not err in concluding that Respondent was dangerous to himself and ordering commitment.  However, because the trial court impermissibly committed Respondent to a term in excess of the statutory maximum, we reverse the trial court's entry of a 120-day commitment period and remand the case to the trial court for entry of a commitment period in compliance with N.C. Gen. Stat. § 122C-271.

AFFIRMED IN PART; REVERSED IN PART AND REMANDED.

Judges STROUD and BERGER concur.